UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**UNITED STATES OF AMERICA**,

                  Plaintiff,

    v.

**PAMELA MARIE MCGOWAN**,

               Defendant.

Case No. 3:10-cr-00487-KI
             3:12-cv-00397-KI

OPINION AND ORDER

S. Amanda Marshall
United States Attorney
District of Oregon
Stephen F. Peifer
Assistant United States Attorney
1000 SW Third Ave., Suite 600
Portland, OR 97204-2902

    Attorneys for United States of America

Michelle A. Ryan
Law Office of Michelle A. Ryan, LLC
3050 SE Division St., Suite 225
Portland, OR 97202

      Attorney for Defendant

KING, Judge:

Pamela McGowan plead guilty to the following crimes:  Conspiracy to Commit Armed Bank Robbery through the use of Handguns, in violation of 18 U.S.C. §§ 2113(a) and (d) and 924(c)(1)(A); Armed Bank Robbery in violation of 18 U.S.C. §§ 2 and 2113(a) and (d); Using and Carrying a Firearm During and in Relation to a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A); and Armed Bank Robbery in violation of 18 U.S.C. §§ 2 and 2113(a) and (d).  I sentenced her to 120 months' imprisonment.

I have pending before me McGowan's Amended Motion to Vacate, Set Aside, or Correct Sentence [ECF No. 132].[1]  For the following reasons, I deny her motion without an evidentiary hearing.

## FACTS

I.    <u>Facts Known to the Court at the Time of McGowan's Guilty Plea and Sentencing</u>

McGowan, her then-boyfriend, Stanley Ames, and their friend, Eric Wilcoxson, committed two armed bank robberies in September and October 2010; McGowan later admitted they were planning a third when they were arrested.  On both occasions, Ames and Wilcoxson wore masks from the movie "V for Vendetta," entered the banks, and fired gun shots.

---

[1]The Amended Motion to Vacate or Correct Sentence [ECF No. 132] replaces the Motion to Vacate or Correct Sentence Under 28 U.S.C. § 2255 [ECF No. 89].

The first robbery, on September 18, 2010, took place at a bank located on Southeast Woodstock Boulevard.  Ames and Wilcoxson, wearing hooded sweatshirts and the masks, burst into the bank brandishing semi-automatic pistols.  Wilcoxson raised his gun and fired into the ceiling.  Several customers managed to escape.  One witness, when speaking to police afterward, "was visibly shaken . . . it took a while for him to calm down and talk."  PSR ¶ 13.[2]  One witness was able to grab her 2-year-old son and run out of the bank, while hearing gunfire and people dropping to the ground around her.  Ames and Wilcoxson ordered customers to the ground, then directed the tellers to open the secure teller door and all their cash drawers.  A manager addressed the robbers in an attempt to keep her staff safe, but Ames and Wilcoxson seemed "extra aggravated" with her for getting up from her desk.  The men took $11,490 from the drawers, left the bank, jumped into the waiting car, and McGowan drove them away.

The October 8 bank robbery was similar, but Ames fired a shot into the ceiling and then fired a second shot toward the teller area.  When the bank tellers did not open the security door quickly enough, Ames pointed his gun at a customer on the ground and said, "Let me in or I will shoot this fucker."  PSR ¶ 23.  Ames then fired a third shot into the security door's lock.  One of the tellers opened the door thinking Ames might very well shoot the customer.  After the tellers opened the drawers, Ames grabbed one of the employees by the shirt and shoved him out of the way.  Ames collected $11,618.  Wilcoxson then told the three tellers, "Run out or I will shoot you" and then "Don't stop, don't fucking use your cell phones, just keep running."  PSR ¶ 25.

_____

[2] The Presentence Investigation Report, which was not previously docketed, will be filed under seal simultaneously with the docketing of this Opinion.

Ames and Wilcoxson got into the getaway car and McGowan drove the car away.  When police arrived, the tellers were visibly shaking and trembling.

McGowan was arrested on November 10, 2010.  As the Probation Officer who wrote the Presentence Investigation Report commented, "Robbery investigators were openly interested in the motivations of the three codefendants.  All were clearly intelligent, well-educated, and employed."  PSR ¶ 43.  McGowan answered a number of the investigators' questions, such as: Did you feel bad for the people in the bank?  "Sure."  Was it part of the plan to have gunshots?  "I don't think . . . I don't know if I should answer that one."  Why purchase body armor?  "Protection."  From whom?  "You guys."  Did you know shots would be fired?  "Not for certain."  How do you feel about the robberies?  "I told you.  I feel awful."  Why rob a bank?  "Tired of being a slave."  Of what?  "Jobs and debt."  She then said the robberies were not intended as a social statement and, in tears, said, "I just got really tired of not making my own decisions and not living my own life."  They had all promised not to hurt anyone.  If someone refused to cooperate, "the idea was to shoot a bullet not at a person, but directed near so that it looked as if someone was hurt.  Just to scare people."  She told police the trio had been planning a third robbery for November 12.  PSR ¶¶ 39-42.

McGowan and the men planned the robberies by way of what she called "group think."  She bought the vehicles under fictional names; she drove Ames and Wilcoxson to and from the banks, with a loaded AR-15 within her reach.  McGowan knew about and approved their use of firearms in the banks.  She purchased body armor for the three of them and prepared "go bags" with clothing and passports should they need to escape.  Wilcoxson confirmed that he, Ames and

McGowan had studied other bank robberies and had utilized methods they thought would help them.

McGowan first appeared in court on November 12.  John Ransom, an attorney with 35 years' experience as a defense attorney, represented McGowan throughout the proceedings, beginning with her November 16 detention hearing.  On December 9, she was arraigned and entered a not guilty plea to the following charges:

> Count 1 – Conspiracy to Commit Bank Robbery, 18 U.S.C. § 371, five-year maximum term;

> Count 2 – Armed Bank Robbery, 18 U.S.C. §§ 2113(a) and (d), 25-year maximum term;

> Count 3 –Using, Carrying, Brandishing and Discharging a Firearm During and in Relation to a Crime of Violence, 18 U.S.C. § 924(c)(1)(A), ten-year minimum to maximum of life imprisonment, to be served consecutively.

> Count 4 – Armed Bank Robbery, 18 U.S.C. §§ 2113(a) and (d), 25-year maximum term;

> Count 5 – Using, Carrying, Brandishing and Discharging a Firearm During and in Relation to a Crime of Violence, after commission of the offense in Count 3, 18 U.S.C. §§ 924(c)(1)(A) and (C)(i), 25-year minimum to maximum of life imprisonment, to be served consecutively.

Indict. [ECF No. 19].

She sought reconsideration of her detention on January 5, 2011, which I denied.

Ransom hired Richard M. Kolbell, Ph.D., to examine McGowan and produce a report.[3] Dr. Kolbell reviewed police reports, McGowan's journal entries, a counseling chart she and Ames had created, and a letter from McGowan to Ames that the jail had confiscated.

---

[3]I read Dr. Kolbell's report prior to sentencing McGowan.

In her journal, McGowan described her employment as an engineer and an "encounter with her supervisor on September 3, 2010, in which she felt that the supervisor's statements and behaviors had made her feel 'embarrassed and degraded[.]'"  She confronted her supervisor, who apologized for making the comments.[4]  Kolbell Report 2 [ECF No. 72, Sealed].  A few days after this, her supervisor discussed the possibility of layoffs.  McGowan quit the next day.

Dr. Kolbell also reviewed McGowan's journal entries reflecting her

> relationship with Mr. Ames . . . may have been deteriorating, including "screaming matches," increasing conflict, and, on at least one occasion, apparently Mr. Ames breaking a door.  She described her "insecurity and [his anger] are going to destroy this relationship.  I was and still want to go to counseling to heal myself . . . I am willing to do anything to save our relationship."  She also made oblique reference to attending counseling "for my issues," although didn't specify this.  Entries from August and September 2009 reflect a very detailed, highly organized chart and a series of strategies proposed to help the couple resolve conflict in their relationship.

Id. at 2.  Dr. Kolbell also described the four-page letter from McGowan to Ames dated November 18, 2010, that had been confiscated by the jail, in which McGowan repeatedly underscored her love for Ames.

Dr. Kolbell met with McGowan on two occasions.  He estimated her intellectual abilities to be in the high-average range, with an excellent vocabulary.  She described her mother as "very competitive . . . she was always selfish . . . so involved in herself . . . never realized she needed to care about someone else."  Id. at 3.  When her stepfather physically assaulted McGowan, McGowan's mother took his side.  Dr. Kolbell recognized that McGowan's mother was unavailable physically and emotionally and that McGowan felt abandoned by her mother.

---

[4]McGowan wrote in her journal that, while discussing pipe supports, her supervisor told her she "could be the Pole Queen" for the project and that McGowan "might like that." McGowan also wrote that her supervisor apologized "profusely" when she confronted him. Ransom Aff., Ex. 2

McGowan also described a two-week period during which her first boyfriend raped her, sometimes as often as three times a day.  The boyfriend broke up with her over the phone one month later and she felt "used, worthless, betrayed."  Id. at 4.  She dealt with the trauma by running excessively, drinking alcohol, and engaging in multiple, unhealthy sexual encounters. She eventually sought counseling.

With respect to her relationship with Ames, she acknowledged that he pursued a relationship with her in an "almost stalker-ish" way, but denied feeling uncomfortable.  Id.  He was evasive about his past, but eventually confessed to raping his brother and a female cousin. She was in love with him by then; she knew, given her experience with her first boyfriend, a relationship with Ames "didn't make logical sense," but she "took a risk, knowingly."  Id.  Dr. Kolbell noted, "This suggests impaired thinking and decision-making, given her history of rape and his conviction for sexual crimes.  This is not uncommon among rape victims, who may become dependent, submissive, and form pathological relationships."  Id.  She told Dr. Kolbell that Ames "'showed me how to be comfortable around men, I showed him how to function in normal society.'  She described that she was entirely monogamous in her relationship and eventually was able to enjoy physical intimacy."  Id. at 5.

With regard to the robbery, McGowan said Ames initiated a conversation about robbing a bank, but she did not want to discuss the subject with Dr. Kolbell further as she was concerned about Ames.  "She acknowledged that she was perfectly willing to suffer a greater penalty in her own case in order to protect him."  Id. at 6.  At a subsequent meeting, after discussing the issue with Ransom, she reiterated to Dr. Kolbell that Ames was the instigator for the bank robberies. She was willing to go along with the idea because, "I'd rather sit in my cell than go back to that

job." Id.  Without Ames' influence, she said she "would have done something stupid . . . like sold my house and quit my job." Id.  In response to that comment, Dr. Kolbell noted, "These appear to be rather reasonable and realistic solution[s], and not particularly 'stupid', again suggesting poor independent judgment and decision-making." Id.  McGowan conceded she was following Ames' lead, that she "was so jaded . . . I just didn't care . . . it was pretty selfish." Id. She believed Ames "instigated the bank jobs to protect me . . . he's always protecting me," and that she was "reluctant to take [a] leadership role." Id.

She reported that she had shifted in her thinking, after talking with Ransom, from wanting to protect Ames to "working with my attorney to try and get Stan to agree to let me testify against him." Id.  Dr. Kolbell pointed out in his report that, "Despite this shift, Ms. McGowan still discusses her own decisions with respect to whether Mr. Ames would agree to permit her to testify against him and protect herself.  This suggests some continued significant dependency and submissiveness in her relationship with Mr. Ames." Id.

Dr. Kolbell indicated that McGowan denied any current symptoms of active PTSD, but noted her symptoms following the rape suggested a possible prior diagnosis.  He diagnosed Generalized Anxiety Disorder, Dysthymia, Personality Disorder (NOS, with Prominent Dependent and Avoidant Features).  After discussing McGowan's conflicts with her mother, her difficulty forming peer relationships, and her first sexual experience, Dr. Kolbell noted McGowan is "prominently insecure, lacks self-confidence, and copes with it largely through denial, avoidance, and adopting an air of cool, detached capability.  This is quite common among individuals who have suffered trauma and are fundamentally insecure and lack self-confidence,

and who are otherwise exceptionally bright and able to effectively mask their insecurity." Id. at

8-9.

> With regard to Ames, Dr. Kolbell opined:
>
> Consistent with her history and personality, she came to see [Ames] as her protector, provider, and source of acceptance and nurturing, such that she became attached and dependent on him in what appears to be a frankly pathologic fashion. Given her strong needs for perceived safety, acceptance, and nurturance, she is quite vulnerable to the guidance, direction, and manipulation of others who may be more adept and psychologically powerful and, perhaps, dominating, controlling and manipulative. Ms. McGowan is pathologically inclined to submit to the demands of others, particularly males, and clearly may subjugate her own needs and best interests in the service of a dominant male; this appears to characterize some, if not much, of her relationship with Mr. Ames. While she may be able to intellectually rationalize and argue her position, in her relationship with Mr. Ames, ultimately, she is much more inclined to submit to his urgings and wishes, while placing her own needs second.

Id. at 9.

McGowan was the first of the three to enter a guilty plea. On July 7, she plead guilty to a

superseding information. The government agreed in the plea agreement to recommend a

downward departure to reach a final sentence of 120 months. The plea agreement prohibited

McGowan from requesting any additional downward departures and prohibited her from asking

for a sentence of less than 120 months.

McGowan participated in a presentence interview. She reported moving on a yearly basis

during her childhood and described her mother "as unstable and almost pathologically jealous."

PSR ¶ 79. McGowan was not allowed to participate in after school-activities and her mother

kept McGowan "very, very sheltered." Id. She also reported her mother "was very emotionally

abusive. She was very competitive, very passive-aggressive. No hugging, no 'I love you.' She

does judgment and wrath very well." PSR ¶ 80. As soon as she graduated from high school she

"moved as far away from my mom as possible."  PSR ¶ 84.  McGowan also described her first

boyfriend and the "nightmarish . . . two or three weeks" that he spent raping her and beating her.

PSR ¶ 85.  After that experience, students at the Oregon Institute of Technology, where

McGowan was enrolled, were aware of the "Don't Touch Pam" rule because she would startle

and cringe away from physical contact.  She also reported that, during her first job after college,

her supervisor subjected her to "increasing sexual harassment."  She purportedly "quit her job in

September 2010, the day after her superior, 'told me I should be a stripper.'"  PSR ¶ 96.

> Regarding her relationship with Ames, the PSR reflected:
>
> When Pam was 20, she met a fellow student at OIT, Stanley Noel Ames.  Ames was 26 years old and also in the engineering program, and she says they got along immediately.  Within two months, they were living together.  In 2008, after Pam graduated, she and Ames moved to Portland, where they have lived ever since.  She and Ames (a codefendant in this case) have been together for the last five years, and Pam credits him with helping her overcome her social problems.

PSR ¶ 87.  In her comments on the draft PSR, McGowan specifically asked Ransom to report to

Probation that Ames "was a positive influence upon her in overcoming her social problems."

Ransom Ltr. attached to PSR (Aug. 15, 2011).

Prior to McGowan's sentencing date, Ransom submitted a letter to me.  In it, Ransom

acknowledged he was not permitted to ask for a sentence less than 120 months but, because he

knew the range exceeded 120 months, he offered some commentary.  Ransom noted McGowan's

dysfunctional childhood and that she was a hard worker with a good education.  He highlighted

Ames' influence over her and suggested that, because of Ames, McGowan began to embrace a

theory of corporate corruption and control of the little people; Ransom argued McGowan's

decision to quit her job because of sexual harassment was "an example of uncompromising

devotion to the theory."  Gov't Ex. A, at 2.  Ames was the originator of the bank robbery idea,

and Ransom argued that McGowan's agreement exemplified "[t]he tremendous influence Mr.

Ames exerted over her life[.]  She agreed to something contrary to every fiber of her being."  Id.

Ransom ended his letter by stating,

> In summary, before the Court is a woman who, like many before her, succumbed to
> the political philosophy of the one she loves who held a Svengali-like influence over
> her.  How and why these things occur are well beyond this letter but they did.  To
> discard every moral she otherwise held dearly is simply inexplicable.

Id. at 3.

Ransom submitted McGowan's five-page letter in which she asked me to relay her

apology to those affected by her actions.  She confessed she still had no explanation for her

actions ten months later, but she was working to overcome the rape and manipulation by her first

boyfriend, and three subsequent rapes by others, emotional abuse from her mother, lack of a

stable home, sexist superiors at work, and lack of a stable father figure.  She also reported she

was working to overcome "[a]nxiety issues from the emotional abuse I have suffered which has

resulted in me having little to no self confidence in normal life and especially when confronted

by situations outside my daily and limited comfort zone."  Id. at 11-12.  She hinted that she was

motivated to participate in the bank robberies because she needed the money to work on her

sustainability projects "outside a bad 9-5 work environment" and she regretted being "selfish in

justifying the bad means."  Id. at 13-14.  She indicated that she regretted not "stop[ping] things

when I could have" and that "[i]f any one of us would have spoken out," people would not have

been terrorized.  Id. at 14.  She kept "asking myself how we could have let it all happen.  Well, I

don't have a logical answer to that after months of turmoil over it."  Id.  She obliquely hinted at

her continuing love for Ames, writing, "We still love each other, but it is much harder to be there for the ones you love in this situation."  Id.

Ransom also submitted letters from McGowan's father and aunts, as well as a Multnomah County librarian who submitted a copy of a lengthy essay McGowan had written for a Literacy Development Group at the jail.  In the essay, McGowan detailed her anorexia as a child, her poor relationship with her mother (including that her mother refused to let her run with the track team in high school), the incredible amount of work she did for her mother, and how she starved herself after her first boyfriend raped her.  She also described meeting Ames, and explained that they were both broken, he let her cry, and he was the first person she told about the rape.  She said they are "so deeply connected and in love now."  Id. at 26.

The sentencing hearing on October 5, 2011 was a straight-forward affair.  The PSR set the guideline range at 97 to 121 months, plus a 60-month consecutive sentence for the § 924(c) conviction.  A representative from U.S. Bank spoke and described the "reign of terror" her staff felt before the defendants were arrested.  She reported that, as a result of the robberies, staff members had complained of nightmares, irrational fears, being afraid of being left alone, and terror at unexplained noises.  She underscored that it is "completely unheard of" to have guns fired during a robbery as staff is trained to be compliant to demands.  Sent. Tr. 6 [ECF No. 82]. The representative also suggested McGowan "chose to throw her education away for a life of crime and fantasy.  It is time that Ms. McGowan grows up and takes responsibility for her actions."  Id.  The government then moved for its downward departure, putting the non-924(c) counts at a guideline range of 57-71 months.  I granted that motion.  I offered Ransom the opportunity to speak, but he chiefly relied on his letter.  After asking McGowan whether she

wanted to say anything, and learning that she wanted me to read her letter, I read into the record the portions of the letter I believed represented her state of mind.

I then sentenced McGowan to a concurrent 60-month sentence on counts 1, 2 and 4 and a 60-month consecutive sentence on count 3, for a total sentence of 120 months' imprisonment.

Five months later, McGowan filed her Motion to Vacate or Correct Sentence Under 28 U.S.C. § 2255, in which she raised among other things an issue about Ames' alleged abuse of her. Ames and Wilcoxson entered guilty pleas two weeks later. I sentenced Ames to imprisonment for 220 months and Wilcoxson to imprisonment for 180 months.

II.    Facts Known to Ransom at the Time of his Representation of McGowan

Ransom has represented many women over the years. As a result, he "was extremely cognizant of the relationship between Ms. McGowan and her boyfriend, Mr. Stanley Ames. Any time one represents a woman in a criminal case there is always a substantial possibility the woman's activities were directed by or coerced by a male figure in her life." Ransom Aff. ¶ 8. There were no police reports, however, or any other evidence that McGowan was a battered woman. Ransom believed McGowan "held the upper hand because Mr. Ames was on post-prison supervision and was a registered sex offender, all of which she knew." Id. at ¶ 9. He thought the very specific chart McGowan and Ames had completed as part of their counseling effort also demonstrated McGowan's control. Ransom did not believe McGowan suffered from PTSD because she had engaged in an active sex life with Ames–the very activity that caused her trauma initially.

Ransom conversed with McGowan on the phone a total of just over 24 hours. He met with her in person an additional 15.7 hours. On some of these occasions, he questioned her about

her relationship with Ames but she "rebuffed all my efforts to get her to admit that Mr. Ames 'controlled' her activities regarding the robberies." Id. at ¶ 10. Instead, she "bragged" about her participation–some of the tactics were her idea, she went to the shooting range to learn how to fire a gun, she devised the plan for buying and ditching the getaway car, and she helped prepare an escape plan. "She told me she was invested in every step of the plan." Id. Ransom urged her, to the extent it was true, to discuss Ames' influence over her when proffering with the government. To the contrary, "[a]t each proffer she went out of her way to state emphatically she did what she did voluntarily and no one made her." Id. at ¶ 17; see also Christensen Aff. ¶ 7 ("Several times during the [proffer] interviews, I and other questioners explicitly asked McGowan if she had acted freely in committing the crimes or if she had acted through the influence of her boyfriend Ames." She insisted she was not coerced or influenced.).

In making a request to Dr. Kolbell to examine McGowan, Ransom indicated that McGowan had hinted at difficulties but she had not disclosed what they were. In addition, he wrote, "She has, to me, downplayed the influence of her boyfriend but I think he is very instrumental in what has occurred. Whether or not he may have influenced her so her will was overborne, I do not know." Def.'s Ex. 101, at 2.

The government initially offered a sentence of 12 ½ years. Ransom argued for a 10-year recommendation. He believed this was the best offer he could get from the government given that the § 924(c) count carried a 60-month mandatory minimum. In fact, he did not believe a 10-year sentence for the violent crimes was unreasonable and he was never sure McGowan "fully appreciated the impact of her crimes." Ransom Aff. ¶ 5. He hoped I would impose a seven-year sentence.

Page 14 - OPINION AND ORDER

When Ransom asked McGowan's father to write a letter to the judge, he "wanted me to explain my daughter's relationship with her boyfriend, Stan Ames. I explained to him that I was unable to do that because I never had detailed conversations with her about Stan . . . . I did not spend much time with Stan. I believe my wife, Melinda, may have noticed things that I did not." Vance McGowan Aff. ¶¶ 8, 9. Melinda McGowan did not submit a letter prior to the sentencing hearing.

III.    <u>Facts Presented With McGowan's Motion for Relief Pursuant to § 2255</u>

McGowan submitted a vast array of material with her motion and her reply. As she explains, the material depicts the following:

(1) A childhood full of isolation, neglect, emotional abuse, and exposure to domestic violence;

(2) McGowan's distrust of men;

(3) Her college medical team suspected she had PTSD based on her symptoms and victimization by her first boyfriend;

(4) Her college co-workers were very concerned about her relationship with Ames with one witness making sure McGowan had a knife to defend herself against Ames.

(5) Her mental health counselor from college referred her to the local domestic violence shelter several times and "strongly recommended that she get an advocate/counselor and line up resources i.e. get restraining order to keep herself safe," and made sure she had a safety plan;

(6) Her family noticed that she was on an invisible leash with Ames such that she could not do things without his permission or presence; and

(7) Her overall mood and physical attire changed after she and Ames moved in together.

Def.'s Reply 9-10.

Page 15 - OPINION AND ORDER

McGowan says Ransom never asked her what her family and friends thought about Stan, he never retrieved her medical and psychological records from OIT despite her requests, and he never asked her how Ames treated her.  She also says that if Ransom had asked her, she would have told him her sister thought she was in an abusive relationship; being faced with her medical and counseling records would have forced her to confess Ames' abuse of her.  McGowan concedes Ransom asked her about the counseling chart in which McGowan reported Ames' escalating anger, and he asked whether Ames had hurt her, but he initiated the conversation over the phone.  She claims that if he had asked her about the subject in a face-to-face meeting, she would not have been able to deny the abuse.  McGowan also contends that she was not motivated by any anti-corporate political beliefs, and that these were Ames' beliefs that she merely parroted; her motivation was to "keep my boyfriend from flipping out and hurting me.  So I agreed with whatever he said."  McGowan Aff. ¶ 28.

McGowan provided affidavits from (1) her father (stating that Ransom never questioned him about McGowan's childhood or counseling), (2) one aunt (indicating Ransom never questioned her about McGowan's childhood or relationship with Ames; Pam "went from a controlling mother to a controlling Stan"), (3) another aunt (stating that McGowan had an isolated childhood, McGowan had to ask Ames for permission to leave), and (4) a cousin (reporting that Ames never let McGowan do anything by herself; McGowan showed signs of being in an abusive relationship, like looking unattractive).  A co-worker submitted an affidavit (indicating McGowan did not like to be touched; her relationship with Ames developed fast) as did her counselor at OIT (the counselor was concerned about McGowan's relationship with Ames; McGowan would do "*anything* to keep the peace; therefore, she would do what he said;"

Page 16 - OPINION AND ORDER

the counselor encouraged McGowan to make a safety plan).  McGowan also submitted

psychological and medical records from OIT, Kaiser Permanente, and the Multnomah County

Jail.

Linda Grounds, Ph.D., examined McGowan over the course of two days, and wrote a

report detailing her findings and summarizing at length the interviews of family members, co-

workers, and McGowan's college mental health counselor.  Dr. Grounds elaborated on the

psychological abuse McGowan suffered at the hands of her mother and–for the first

time–disclosed the details of Ames' emotional and sexual abuse of McGowan.  McGowan now

reported that Ames had asked her 'if we could really rob a bank.  I told him I would not do that

on my own, did not want trouble.  He insisted and I went along with what he said like everything

else in our relationship.  I did what I was told."  Def.'s Ex. 109, at 40 [ECF No. 190, Sealed].

Dr. Grounds diagnosed McGowan with PTSD, Major Depressive Disorder, Anxiety

Disorder Not Otherwise Specified, Personality Disorder Not Otherwise Specified with Avoidant,

Dependent, and Passive-Aggressive features.  Dr. Grounds conceded that "Dr. Kolbell did offer

observations and hypothesis about Ms. McGowan's relationship with Ames that are quire

consistent with this examiner's, though with much less detail and a lower level of confidence as a

result of having less information."  Id. at 48.  In her opinion, several factors explained

McGowan's failure to disclose Ames' abuse to Ransom or Dr. Kolbell, including McGowan's

psychologically abusive childhood, Ames' continued and significant influence over her, the fact

that both Ransom and Dr. Kolbell are men, and the lack of in-person conversations.  In her

affidavit, Dr. Grounds reported it often takes a victim of domestic violence time to disclose the

abuse, and that face-to-face meetings, follow-up questions, and a quiet and slow style help to

develop a rapport.  Victims may deny, minimize or rationalize their relationships and need time to disclose negative details.

Dr. Kolbell took a second look at McGowan's case and submitted an affidavit in support of her motion.  He reviewed the medical and counseling records he did not have before, as well as McGowan's mother's sentencing letter, and Ransom's written request to the mother not to send her letter.  Dr. Kolbell agreed the information would have been "useful for me in evaluating Ms. McGowan."  Def.'s Ex. 115, at 3.  He believed it would have "influenced my examination, recommendations for further investigation by Mr. Ransom, and ultimately enhanced my opinions and conclusions, and further substantiated my diagnoses."  Id. at 3.  He also believed he would have sought or recommended hiring a domestic violence expert to examine McGowan and educate the court.

Finally, McGowan submitted an affidavit from Marc Sussman, also a 35-year veteran of the law.  Sussman opined that the amount of time Ransom spent with McGowan in face-to-face meetings, which he calculated as under fourteen hours, "is not sufficient to develop the kind of trusting, working relationship necessary to gain a defendant's confidence and trust in order to investigate and develop the information needed to effectively prepare a defense to the crimes and mitigating factors for sentencing."  Sussman Aff. ¶ 13.  Sussman nearly always hired an investigator to gather mitigation information and then used that information to confront clients who were resistant to disclosing relevant details about their lives; the fact that Ransom did not hire such an investigator "was inconsistent with the prevailing practice for investigating cases with the type of issues presented here."  Id. at ¶ 26.  Sussman believed a domestic violence expert would have made a "big difference" in McGowan's psychological evaluation.  Id. at ¶ 30.  He

would not have hired Dr. Kolbell (a neuropsychologist), but would have hired Dr. Grounds based on her expertise with PTSD in abused women.  Sussman found Ransom's sentencing and PSR-objection letters to be "anemic."  Id. at ¶ 49.  Finally, Sussman believed Ransom would have been on stronger ground in negotiating a plea agreement and in supporting a sentence under 10 years had he delved into McGowan's background more fully.

### LEGAL STANDARDS

28 U.S.C. § 2255 provides, in part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

Under Section 2255, "a district court must grant a hearing to determine the validity of a petition brought under that section '[u]nless the motions and the files and records of the case *conclusively show* that the prisoner is entitled to no relief.'"  United States v. Blaylock, 20 F.3d 1458, 1465 (9th Cir. 1994) (quoting 28 U.S.C. § 2255(b)) (emphasis in the original).  An evidentiary hearing is warranted if "accepting the truth of [the petitioner's] factual allegations, [she] could have prevailed on an ineffective assistance claim."  Id.

### DISCUSSION

To be successful in making out an ineffective assistance of counsel claim, McGowan must show her counsel's errors were (1) outside the wide range of professionally competent assistance, and (2) "there is a reasonable probability that but for counsel's unprofessional errors, the result would have been different."  Strickland v. Washington, 466 U.S. 668, 694 (1984).

"The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.  Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result."  Id. at 697.  On the issue of prejudice, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding[,]" rather, McGowan must show that the errors "actually had an adverse effect on the defense."  Id. at 693.

Prior to entering a guilty plea pursuant to an agreement, McGowan was facing a total of at least 35 years of consecutive, mandatory minimum sentences and trial was not an option.  McGowan seems to recognize that truth and focuses instead on the things Ransom should have done to influence the plea negotiations and change her sentencing outcome.  Specifically, Ransom should have:

(1)  conducted an investigation into the facts and circumstances surrounding the crimes and [McGowan's] background which would have revealed mitigation evidence;

(2)  hired an investigator or mitigation specialist to interview McGowan and her family and friends for mitigation purposes, such as uncovering evidence in support of battered woman's syndrome, childhood trauma, rape, domestic violence, symptoms of post-traumatic stress disorder, coercion/duress, and diminished capacity;

(3)  obtained medical, psychological, and jail records that would have revealed the multitude of symptoms of trauma response, including severe anxiety, weight loss, rashes, and amenorrhoea;

(4)  corroborated McGowan's autobiographical account of her life by interviewing witnesses who could have explained that McGowan was raised by a very controlling mother and was in a relationship with a controlling and abusive boyfriend/co-defendant;

(5)  retained a forensic psychologist whose expertise includes evaluating female defendants, including the role of male co-defendants and domestic violence relationships as they relate to mitigation, post-traumatic stress disorder, and women's offense conduct; and

(6)  presented this evidence to the prosecutor and judge in order to enable McGowan to receive a different plea agreement and sentence.

Def.'s Mem. 2.

Where, as here, the allegations, even if true, do not state a claim for relief, a hearing is unnecessary.  Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995).  With respect to anything the government may have done, it reports:

There was no chance the government would have gone below a ten-year sentence for this defendant.  The circumstances of the crimes were simply too egregious, irrespective of any possible mitigation in defendant's background.  Indeed, the government *assumed* that defendant, with a totally crime-free past, would not have committed these horrendous acts without Ames's significant influence on her. Nevertheless, the crimes were simply too serious to justify less than a ten-year sentence.

Govt's Resp. 15-16.

Similarly, I could not say McGowan's sentence would have been different had Ransom provided the mitigation information to me.  While I am sympathetic to McGowan's belief that she could have changed the outcome of her sentence, I knew or divined the vast majority of what she presents to me now.  Dr. Kolbell's report, though not as detailed as Dr. Grounds', revealed that McGowan's relationship with Ames was punctuated by anger and conflict and that she was unduly influenced by him in a "frankly pathologic fashion."  Kolbell Report 9.  Like the government, I assumed McGowan would never have engaged in this aberrant criminal conduct had she not come under Ames' influence.  Additionally, both the doctor's report and the PSR extensively discussed McGowan's emotionally abusive mother and the rapes McGowan

Page 21 - OPINION AND ORDER

experienced over a two-week period at the hands of her first boyfriend. I also read and considered McGowan's eight-page, detailed essay she had written for her jail literacy group prior to sentencing her.

The fact of the matter is that both the government and I had all the information necessary to reach a reasonable sentence. McGowan now fills in some of the blanks and provides more detail and corroboration than the government and I had at the plea and sentencing, but what I know now would not have changed McGowan's sentence. The government recommended a sentence three years less than McGowan would have received had I simply implemented the guidelines with the consecutive § 924(c) mandatory minimum sentence. She is an intelligent person who had sought counseling and help before. She knew Ames and Wilcoxson used weapons to terrify bank tellers and customers. She participated in the two bank robberies and was helping to plan a third. A sentence of 120 months, for participating in bank robberies at the top of the violent and dangerous bank robberies I have seen in my time on the bench, was reasonable and appropriate.

III.    <u>Remaining Claim</u>

Without briefing her arguments, McGowan contends in her motion that her guilty plea was involuntary for a number of reasons. She waived such a claim as part of her guilty plea; there is no evidence McGowan's waiver of that right was itself involuntary. <u>United States v. Jeronimo</u>, 398 F.3d 1149, 1153 (9th Cir. 2005), <u>overruled on other grounds by</u> <u>United States v. Castillo</u>, 496 F.3d 947 (9th Cir. 2007) (en banc); <u>see also</u> <u>Bousley v. United States</u>, 523 U.S. 614, 621 (1998) ("the voluntariness and intelligence of a guilty plea can be attacked on collateral

review only if first challenged on direct review").  The only claim available to McGowan is one based on ineffective assistance of counsel, which I have rejected.

## CONCLUSION

For the foregoing reasons, McGowan's Amended Motion to Vacate or Correct Sentence Under 28 U.S.C. § 2255 [132] is denied.  Her Motion to Vacate or Correct Sentence [89] is denied as moot.  Because McGowan has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is denied.  See 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this _____16th_____ day of September, 2014.


 /s/ Garr M. King_____
Garr M. King
United States District Judge